UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION FOR SEARCH WARRANTS | Case No: 3:21-mj-____ (RAR) |
| | **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS

I, Ryan Mahar, being duly sworn, depose and state as follows:

### BACKGROUND OF AFFIANT

1.     I am a Special Agent with Homeland Security Investigations ("HSI"), and I have been employed by HSI as a Special Agent since July 2011. Prior to serving as a Special Agent with HSI, I was employed as a Special Agent with the United States Secret Service ("USSS") for approximately nine years. I am presently assigned to the HSI office in Hartford, Connecticut. I have received extensive training provided by the Federal Law Enforcement Training Center, the USSS, and HSI in the investigation and enforcement of laws of the United States. I have received training in the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation, and have, as part of my daily duties as an HSI agent, investigated violations relating to child exploitation and child pornography, including violations pertaining to the possession, distribution, receipt and production of child pornography, the online enticement of minors, and the traveling in interstate and foreign commerce to engage in sexual activity with minors, in violation of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423. I have participated in the execution of numerous search and arrest warrants involving child exploitation and/or child pornography offenses. I also serve as a computer forensic examiner with HSI.

2.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws

and duly authorized by the Attorney General to request a search warrant. I am one of the officers involved in the investigation that is the subject of this affidavit and have personally participated in the investigation concerning the violations of the federal laws listed herein.

3.     As discussed more fully herein, I am investigating CHRISTOPHER JESUS CONSTANZO ("CONSTANZO") for the following federal offenses:  kidnapping a minor, in violation of 18 U.S.C. § 1201(a)(1), production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and using and attempting to use a means or facility of interstate commerce to persuade, induce, entice, or coerce a minor to engage in unlawful sexual activity in violation of 18 U.S.C. § 2422(b) (collectively the "TARGET OFFENSES").

4.     On December 6, 2021, this Court issued a criminal complaint and arrest warrant for CONSTANZO, charging him with kidnapping a minor, in violation of 18 U.S.C. § 1201(a)(1). *See United States v. Constanzo*, Case No. 3:21-mj-1190 (RAR). CONSTANZO was arrested on that warrant on December 7, 2021 in the District of Vermont. His initial appearance in the District of Connecticut occurred on December 27, 2021.

5.     On December 29, 2021, this Court issued search warrants for an AT&T Fusion Z cellular telephone phone that was in CONSTANZO's possession when he was arrested in the District of Vermont on December 2, 2021 and for cellular records, including cell site location data, for phones associated with CONSTANZO and the Minor Victim. *See United States v. Constanzo*, Case Nos. 3:21-mj-1254, 1255 and 1256 (RAR).

6.     I now make this affidavit in support of applications for supplemental search warrants for the following:

     a.     information associated with the following accounts that are stored at premises controlled by Snap Inc. ("Snapchat"), a company which is headquartered and accepts

service of legal process, at 2772 Donald Douglas Loop North, Santa Monica, California, as more fully described in Attachment A-1:

- "bduchimaza3" ("TARGET SNAP ACCOUNT 1")

- "c_constanzo2019" ("TARGET SNAP ACCOUNT 2")

- "kurt_romen2020" ("TARGET SNAP ACCOUNT 3")

- "raul_rex20" ("TARGET SNAP ACCOUNT 4")

b.      information associated with the following accounts that are stored at premises controlled by Google LLC ("Google"), a company which is headquartered and accepts service of legal process, at 1600 Amphitheatre Parkway, Mountain View, California, as more fully described in Attachment A-2:

- "christopherconstanzo5@gmail.com" ("TARGET GMAIL ACCOUNT 5")

- "luciferio2019@gmail.com" ("TARGET GMAIL ACCOUNT 6"),

- "raymondregem@gmail.com" ("TARGET GMAIL ACCOUNT 7");

c.      information associated with the following account that is stored at premises controlled by Apple Inc. ("Apple"), a company which is headquartered and accepts service of legal process, at One Apple Park Way, Cupertino, California, as more fully described in Attachment A-3:

- an Apple iCloud account associated with Apple ID "christopherconstanzo5@gmail.com" ("TARGET iCLOUD ACCOUNT 8");

d.      One Apple iPhone SE with Serial Number DX3FW05NPLJY (the "DEFENDANT'S PHONE"), as more fully described in Attachment A-4, and the contents

3

contained therein.  The DEFENDANT'S PHONE is presently in the custody of Torrington Police Department in Torrington, CT.

7.      With respect to the search warrants for information stored at premises controlled by Snapchat, Google and Apple (collectively, the "Providers")[1], I make this affidavit under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require the Providers to disclose to the government copies of the information described in Sections I of Attachments B-1, B-2 and B-3, respectively and upon receipt of that information, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1, B-2  and B-3.

8.      Based on the information set forth in this affidavit, I believe there is probable cause to believe that information associated with the accounts listed in paragraphs 6a, 6b and 6c above constitutes and contains items that constitute instrumentalities, fruits, and evidence of the TARGET OFFENSES.

9.      In addition, I believe there is probable cause to believe the DEFENDANT's PHONE constitutes and contains items that constitute instrumentalities, fruits, and evidence of the TARGET OFFENSES, as more fully described in Attachment B-4.

10.      In December 2021, January 2022 and February 2022, I sent preservation letters to the Providers requesting preservation of the information associated with the accounts listed in paragraphs 6a, 6b and 6c above for 90 days.

11.      The statements contained in this Affidavit are based in part on information provided by other members of local, state, and federal law enforcement, my own investigation to include

---

1 This Court has jurisdiction to issue the requested search warrants to the Providers because this Court is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711(3). See 18 U.S.C. § 2703(c)(1)(A). Specifically, the Court is "a district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Moreover, as providers of wireless communications service, the Providers are providers of an electronic communications service, as defined in 18 U.S.C. § 2510(15). See 18 U.S.C. § 2711(1). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of the search warrants.

personal observations, documents and other investigative materials which I have reviewed, as well

my training and experience as a Special Agent with HSI. Since this Affidavit is being submitted

for the limited purpose of securing a search warrant, I have not included each and every fact known

to me concerning this investigation. I have set forth only the facts that I believe are necessary to

establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET

OFFENSES are located within the TARGET RECORDS, as more fully described in four

Attachments A.

## TARGET OFFENSE

12.     As noted above, this investigation concerns alleged violations of:

a.      18 U.S.C.  § 1201(a) provides, in relevant part, "Whoever unlawfully

seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom

or reward or otherwise any person, except in the case of a minor by the parent thereof,

when (1) the person is willfully transported in interstate or foreign commerce . . . or the

offender travels in interstate or foreign commerce . . . shall be punished…."

b.      18 U.S.C. §§ 2251(a) provides, in relevant part, "Any person who employs,

uses, persuades, induces, entices, or coerces any minor to engage in,…, any sexually

explicit conduct for the purpose of producing any visual depiction of such conduct or for

the purpose of transmitting a live visual depiction of such conduct, shall be punished as

provided under subsection (e), if such person knows or has reason to know that such visual

depiction will be transported or transmitted using any means or facility of interstate or

foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual

depiction was produced or transmitted using materials that have been mailed, shipped, or

transported in or affecting interstate or foreign commerce by any means, including by

computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed."

    c.    18 U.S.C. § 2422(b)  provides, "Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense[2], or attempts to do so, shall be [punished]."

## DEFINITIONS

13.    The following definitions apply to this Affidavit:

    a.    "Minor," as used herein, is defined by 18 U.S.C. § 2256(1) to mean any person under the age of eighteen years.

    b.    "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) (any visual depiction including any photograph, film, video, picture, or computer or computer generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction

---

[2] "In this chapter, the term 'sexual activity for which any person can be charged with a criminal offense' includes the production of child pornography, as defined in section 2256(8)."  18 U.S.C. § 2427. In addition, under Connecticut state law, a "person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person[.]" Conn. Gen. Stat. § 53a-70. Also under Connecticut state law, a "person is guilty of aggravated sexual assault in the first degree when such person commits sexual assault in the first degree as provided in section 53a-70, and in the commission of such offense (1) such person uses or is armed with and threatens the use of or displays or represents by such person's words or conduct that such person possesses a deadly weapon[.]" Conn. Gen. Stat. § 53a-70a.

involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct), and also includes any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. § 2256(8).

      c.    "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

      d.    "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital genital, oral genital, anal genital, or oral anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person. 18 U.S.C. § 2256(2)(A).

## **BACKGROUND ON SNAPCHAT, GMAIL AND ICLOUD**

### Snapchat

14.    Snapchat is a mobile social media communication application owned by Snap Inc. and it is available through the iPhone App Store and Google Play[3]. The application provides a way to share moments with photos, videos, and text. Snapchat's differentiating feature from other communications applications is that a sender is able to set a variable amount of time the message is viewable by the receiver. This time can be between one and ten seconds. At the expiration of

---

3 The source for the information listed in Paragraphs 14 through 16 is Snap Inc.'s Law Enforcement Guide, *available at* https://snap.com/en-US/safety/safety-enforcement.

time, the message is deleted from Snapchat's servers. Similarly, the message disappears from the user's devices. If the receiver of a Snapchat message does not access the application on their device the message remains undelivered. Snap's services are designed to store unopened snaps for 30 days. After 30 days the messages are deleted from Snap's servers.

15.     Snapchat users have the following abilities:

e.     Snaps: photos or videos taken using his or her phone's camera (or the Snapchat app's camera), which may be shared directly with the user's friends, or in a Story (explained below), or Chat. Snaps can also be sent from the saved pictures/videos in the gallery of the device. Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). Users are able to save a photo or video they've taken locally to their device or to Memories, which is Snapchat's cloud-storage service.

f.     Stories: A user can add photos or videos (Snaps) to their "Story." A Story is a collection of Snaps (*i.e.*, photos or videos) displayed in chronological order. Users can manage their privacy settings so that their Story can be viewed by all Snapchatters, their friends, or a custom audience. A user can also submit their Snaps to Snap's crowd-sourced service "Our Story," which enables their Snaps to be viewed by all Snapchatters in search and Snap Map. Snap's servers are designed to automatically delete a Snap in a user's Story 24 hours after the user posts the Snap, but the user may delete part or all of the Story earlier. Submissions to Our Story may be saved for longer periods of time.

g.     Memories: Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. Content saved in Memories is backed up by Snap and may remain in Memories until deleted by

the user. Users may encrypt their content in Memories (called "My Eyes Only"), in which case content is not accessible to Snap and cannot be decrypted by Snap.

       h.    Chat: A user can also type messages, send photos (Snaps), audio notes, and video notes to friends within the Snapchat app using the Chat feature. Snap's servers are designed to automatically delete one-to-one chats once the recipient has opened the message and both the sender and recipient have left the chat screen, depending on the user's chat settings. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message that they want to keep. The user can clear the message by tapping it again. This will result in it being deleted from Snap's servers. Users can also delete chats that they have sent to a recipient before the recipient has opened the chat or after the recipient has saved the chat. Users can also chat in groups. Chats sent in groups are deleted after 24 hours whether they are opened or not.

       i.    Location Data: If a user has device-level location services turned on and has opted into location services on Snapchat, Snap will collect location data at various points during the user's use of Snapchat, and retention periods for location data vary depending on the purpose of the collection. Users have some control over the deletion of their location data in the app settings.

16.    Information that Snapchat possesses and maintains:

       a.    Personally Identifying Information: When a user creates an account they make a unique Snapchat username. This is the name visible to other Snapchat users. A user also enters a data of birth. This is supposed to prevent anyone under the age of 13 from using Snapchat. An email address is required to register a Snapchat account. A new user also has to provide a mobile phone number. This phone number is verified during the registration process. Snapchat sends an activation code that must be entered before proceeding with the registration step.

However, a user may elect to bypass entering a phone number so one may not always be present in the user's account. Snapchat also retains the account creation date.

b.      Usage Information: While a Snapchat message may disappear, the record of who sent it and when still exists. Snapchat records and retains log files and information that is roughly analogous to the call detail records maintained by telecommunications companies. This includes the date, time, sender, and recipient of a snap. Additionally, Snapchat stores the number of messages exchanged, which users they communicate with the most, message status including if and when the message was opened, and whether the receiver used the native screen capture function of their device to take a picture of the snap before it disappeared.

c.      Device Information: Snapchat stores device information such as the model, operating system, operating system version, mobile device phone number, and mobile network information of devices used in conjunction with the service. They also collect unique device identifiers such as the Media Access Control (MAC) address and the International Mobile Equipment Identifier (IMEI) or Mobile Equipment Identifier (MEID) of devices used to access Snapchat.

d.      Device Phonebook and Photos: If a user consents, Snapchat can access from their device's electronic phonebook or contacts list and images.

e.      Location Data: may be available for a Snapchat user who has turned on location services on their device and opted into location services in the app settings.

f.      Message Content: Because Snap's servers are designed to automatically delete most user content, and because much of a user's content is encrypted, Snap often cannot retrieve user content except in very limited circumstances. For example, Memories content may be available until deleted by a user.

## Gmail

17.     Gmail is an email service operated by Google. In my training and experience, I have learned that e-mail service providers, including Google, provide a variety of online services, including electronic mail ("email") access to the public. For example, Google allows subscribers to obtain email accounts at the domain name Gmail.com. Subscribers can obtain an account by registering with the service provider. During the registration process, service providers ask subscribers to provide basic personal information. Therefore, the computers of the service providers are likely to contain stored electronic communications (including retrieved and un-retrieved email for the subscribers) and information concerning subscribers and their use of the service providers' services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

18.     A service provider subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by the service providers. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

19.     In my training and experience, the service providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment

11

(including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

20.     In my training and experience, email service providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email service providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

21.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email service providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

22.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contact lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.

23.     Further, information maintained by the email service provider can show how and when the account was accessed or used. For example, email service providers typically log the IP addresses from which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

Apple iCloud

24.     Apple iCloud is a service provided by Apple that, among other things, allows users to store electronic files on Apple's servers, and allows users to access the files from any computer or device with an internet connection. Apple iCloud has been fully integrated into a variety of Apple devices, including Apple iPhones. This integration allows users to directly store files from a his/her iPhone, such as pictures, videos, music, contacts, calendars, e-mails, text messages, web-browser favorites, applications and application data, and other types of files, on his/her iCloud account on Apple's servers. A user can adjust the settings on an Apple device, such as the iPhone, to automatically upload and store certain types of data from the device to an iCloud account without any additional steps by the user. If the user does not delete a file, it can remain on Apple's servers indefinitely. Even if the user deletes a file, it may continue to be available on Apple's servers for a certain period of time. That is because when a file is "deleted", the data contained in the file does not actually disappear; rather, that data remains on the drive or media until it is overwritten by new data.

25.     Online storage providers generally ask their subscribers to provide certain personal identifying information when registering for an account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

26.     Online storage providers such as Apple also typically retain certain transactional information about the creation and use of each account on their systems. This information can

14

include the date on which the account was created, the length of service, records of account access times and durations, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as accessing the account via the provider's website or via another application or device), and other log files that reflect usage of the account. In addition, providers often have records of the internet protocol ("IP") address used to register the account and the IP addresses associated with access to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

## **PROBABLE CAUSE**

### **Initial Federal Investigation of MV1**

27.     On or about December 2, 2021, at approximately 7:27 am, CONSTANZO and a female under the age of 18 ("Minor Victim 1" or "MV1"), whose identity is known to me,[4] arrived at the United States Port of Entry ("POE") at Highgate Springs, Vermont in a green Toyota Camry bearing a Connecticut license plate. Officials at the St-Armand/Philipsburg Border Crossing (on the Canadian side of the international border immediately north of the Highgate Springs POE) refused CONSTANZO and MV1 entry into Canada due to lack of COVID tests.

28.     At the Highgate Springs POE, U.S. Customs and Border Protection ("CBP") officers separated MV1 from CONSTANZO during their inspection for entering the United States. MV1 told the CBP officers she had been kidnapped and sexually assaulted twice by CONSTANZO. MV1 further stated that CONSTANZO had threatened her with a knife while on the way to Canada. A report in the National Crime Information Center ("NCIC") indicated that

---

[4] I am aware that MV is a resident of Torrington, Connecticut. She was born in 2004 and was 16 years old at the time of the offense.

MV1 had been reported by her parents as a missing juvenile from Torrington, Connecticut, last seen around 6:00 pm on December 1, 2021.

29.     During the inspection at the POE, CONSTANZO was patted down by CBP officers, and, consistent with MV1's statement to CBP, a small knife was found on CONSTANZO's person.

30.     CONSTANZO and MV1 were transported to the St. Albans Vermont State Police ("VSP") Barracks for further investigation. Federal and state law enforcements agents then conducted a consensually recorded interview of MV1.

31.     During the interview, MV1 stated she first met CONSTANZO when he worked at fast-food restaurant.[5] She had gone voluntarily to meet CONSTANZO the night before (December 1, 2021). MV1 stated that CONSTANZO sexually assaulted her (including oral, vaginal and anal intercourse) at a specific location in Stillwater, Connecticut[6] prior to holding her against her will. At approximately 7:00 pm that evening,[7] CONSTANZO forced MV1 into the trunk of her family's green Toyota Camry and kept her in the trunk of the vehicle against her will until approximately 4:00 am on December 2, 2021. While she was in the trunk, she was restrained with a shoelace. MV1 stated that at some point in the night, CONSTANZO removed her from the trunk and sexually assaulted her again (including oral, vaginal and anal intercourse), but she was unable to determine where they were at that time.[8]

---

[5] The criminal complaint affidavit stated that MV first met CONSTANZO through a mutual friend. In the audio recording of the interview, MV explained that she met CONSTANZO when he worked at a specific fast-food restaurant she identified. He was an ex-coworker of other people she knew at the restaurant. MV stated she met with CONSTANZO on the evening of December 1, 2021 after a mutual friend indicated he was in some trouble, and MV was trying to be a good friend to him.

[6] I believe this is a reference to Stillwater Pond State Park, within Torrington, in Litchfield County, Connecticut.

[7] The criminal complaint affidavit stated that MV was forced into the trunk of the car at approximately 9:00 pm that evening. In the audio recording of the interview, MV stated she was kept in the trunk of the car from approximately 7:00pm until approximately 4:00 am the next morning.

[8] I am aware that the most direct route to travel by car from Connecticut to the St-Armand/Philipsburg Border Crossing in Canada is by driving through the states of Massachusetts, New Hampshire, Vermont.

32.     MV1 further stated that CONSTANZO removed her from the trunk around 4:00 am because they had gotten close to the Canadian border. As they approached the border, MV1 was seated in the front seat of the vehicle, and CONSTANZO told MV1 to "act normal" and "go along with the story." Upon inspection by the Canadian Border Services Agency, CONSTANZO stated that MV1 was his sister and that they intended to go into Canada for four days to visit friends. Due to a lack of COVID tests, however, they were denied entry into Canada and were turned around to reenter the United States.

33.     MV1 stated that she and CONSTANZO communicated with each other through Snapchat, which is a social media application that, among other features, allows users to communicate with each other through messages and voice calls. MV1 further indicated that she did not think CONSTANZO had service on the phone his phone.

34.     MV1 stated that CONSTANZO took her mobile phone away from her before placing her in the trunk of her car. MV1 also stated that CONSTANZO used her phone to download Google Maps, which I am aware is an application for mobile phones that can use global positioning system ("GPS")[9] technology to provide point-to-point driving directions both a visually on a map displayed on the phone and via audio instructions through the phone's speakers. In addition, MV1 stated that CONSTANZO had used the phone to text her parents that she was okay, which I believe she learned from looking at her phone after the phone was returned to her prior to the interview.

35.     Following the interview, MV1 provided her phone to law enforcement and consented to a search of that phone.

---

[9] GPS is a satellite-based navigation system that can be used to determine the location of a device with GPS technology.

36.     Law enforcement determined that the green Toyota Camry, which MV1 told law enforcement was her parents' vehicle, is registered to a woman sharing MV1's maternal family name at the same address in Torrington, Connecticut where MV1 resides.

37.     An HSI agent in Vermont spoke with MV1's parents on the phone, and they consented to a search of the green Toyota Camry. Among other items in the car, law enforcement located a shoe in the front passenger seat missing its shoelace, a single shoelace in the back seat of the Camry, and strands of hair in the trunk that appeared to be consistent with MV1's hair.

38.     MV1 consented to undergo a Sexual Assault Nurse Examination, and she was transported to a local hospital in St. Albans, Vermont at approximately 11:30 am for the examination.

39.     The search of MV1's phone revealed stored credentials for TARGET SNAP ACCOUNT 1 which included a saved Snapchat username and password. In addition, the review of MV1's phone revealed she used Snapchat to place two outgoing calls on December 1, 2021 at 6:20 pm and 6:21 pm to "Shaggy Costanazo" which were not answered. She then received and answered two calls via Snapchat at 6:25 pm and 6:27 pm from "Shaggy Costanazo".

40.     In addition, during a subsequent forensic interview of MV1, MV1 disclosed that she 15. MV stated that she and CONSTANZO communicated with each other through Snapchat. She also stated that she often deletes messages after she reads them.

41.     Records obtained from Snapchat in January 2022 for TARGET SNAP ACCOUNT 1 revealed that it is an active account created on February 8, 2017 and the last logins to the account occurred on December 1, 2021 at 22:27:54 UTC from Frontier Communications IP Address 32.215.210.126 subscribed to MV1's mother at their home address and a login on December 1, 2021 at 23:18:11 UTC from IP Address 172.56.23.217 operated by T-Mobile.

18

**Torrington Sexual Assault Investigation of MV2**

42.     In the course of my investigation, I learned that CONSTANZO is the subject of an ongoing sexual assault investigation in Torrington, Connecticut for another incident that occurred a couple of months ago prior to the allegations set forth above.

43.     On July 27, 2021, a female under the age of 18 ("Minor Victim 2" or "MV2"), whose identity is known to me, and her parent arrived at the Torrington Police Department and filed a police report. MV2 reported that on July 26, 2021 at approximately 1230 - 1300 hours, MV2 met CONSTANZO outside his house. MV2 and CONSTANZO then walked to an abandoned factory (identified as the Torrington Company building), near the intersection of North Elm Street and McDermott Avenue. They entered the building through an unlocked door. Once inside the building, CONSTANZO told MV2, "Let's get this over with". MV2 took her clothes off after she was instructed to do so by CONSTANZO. At one point, CONSTANZO grabbed her by the throat with his left hand and choked her to the point where she was unable to breathe due to her airway being constricted. MV2 stated that CONSTANZO had a knife in his pocket and an additional one in his backpack. At one point, CONSTANZO pulled one of the knives out and pointed it at her, as he threatened to kill her if she didn't "have sex with him" and "make a porno like Raul said". MV2 stated that CONSTANZO took photos of her while she was undressed, using his cellphone. MV2 stated that CONSTANZO then took her to the bottom floor of the factory where he claimed he kept all of the cocaine. MV2 didn't see any narcotics, but that CONSTANZO claimed the drugs were "behind the big white door". MV2 stated CONSTANZO then forced her to have sexual intercourse with him penetrating her vagina with his penis.

44.     MV2's parent advised police that she keeps track of MV2's whereabouts via GPS (identified as Global Positioning System) on her cell phone. The parent stated that on July 26, 2021, MV2 had been gone from home from approximately 1230 hours to 1400 hours. MV2's GPS on her phone showed a location of 122 North Elm St. This particular address is located across the street from the area of the entrance door to the abandoned Torrington Company building.

45.     MV2's parent also reported that, earlier on July 27, 2021, she had taken MV2 to Winsted Health Center after she complained that her neck hurt when she swallowed. MV2 had originally told her parent that she had been involved in a fist fight with another girl on July 26, 2021, which is why her neck hurt. At the health center, MV2 informed the health workers that she had not been in a fight with another girl, but rather a male party, who she identified as CONSTANZO that had choked her and sexually assaulted her. The parent then brought MV2 to the Torrington Police Department to file a complaint against CONSTANZO.

46.     After this initial report, MV2 advised Torrington Police Department Detective Gelormino that she had not taken a shower but she had changed her clothes after the incident. MV2 also mentioned that she was menstruating, and that prior to CONSTANZO sexually assaulting her, he had her remove the tampon from her vagina. The MV2 reported that the used tampon was discarded somewhere in the abandoned building. MV2 also explained that at one point when she was naked, CONSTANZO grabbed her by the neck, and proceeded to choke her. MV2 reported she peed on herself, because she was terrified.

47.     Torrington Police Detectives took photographs of the injuries that MV2 stated she sustained during the assault, which consisted of a small laceration underneath her chin area, and on her left index finger. MV2 had small contusion marks on the left and right side of her cheek area of her face. MV2 explained that the lacerations were from the knife CONSTANZO was

holding near her chin area. In addition, MV2 stated that the laceration to her finger occurred when she attempted to push the knife away that CONSTANZO was holding to her face.

48.     That same day, MV2 went to Charlotte Hungerford Hospital (CHH) for a sexual assault examination kit. The sexual assault kit along with the clothing MV2's was wearing when she arrived at CHH were later seized by the Torrington Police Department. The sexual assault kit was sent to the State of Connecticut forensic lab for further analysis.

49.     MV2 and her parent signed a consent to search form for her Samsung SM-A102U cellular telephone. Torrington Police Department Detective Fador later completed a forensic examination of MV2's cellphone utilizing Cellebrite forensic software.

50.     Torrington Police Detectives obtained consent from the property manager for the Torrington Company to search the building. Detectives observed the entrance door located on North Elm Street was opened slightly and there was a plastic sheet covering the entrance, preventing access into the building. The property manager later stated that the plastic cover was put up earlier on July 27, 2021 to prevent people from entering the building, since it was reported that individuals had gained access. Detectives then proceeded down a stairwell to the basement near North Elm Street and noticed a used tampon on the stairs which was seized as evidence. Detectives observed that there were small amounts of accumulated water in the basement area of the building, and the floors were filthy throughout. No other evidence was located during the search, and Detectives were unable to locate any pools of urine.

51.     On July 29, 2021, a forensic interview of MV2 was conducted. During that interview, MV2 again reported that CONSTANZO strangled and sexually assaulted er on Monday (July 26, 2021).   MV2 explained that she met CONSTANZO on social media, (Snapchat) but had never met him face to face until the day of the assault. MV2 described

CONSTANZO as being a 19-year-old, tall black male, with dreadlocks. During the week ending February 13, 2021, she was in contact with CONSTANZO via social media regarding the purchase of ecstasy.  CONSTANZO agreed to sell MV2 ecstasy pills and leave them in her mailbox at her residence. MV2 and an acquaintance each consumed a pill, which caused her to "see stuff and black out". After that incident, MV2 and the acquaintance stopped talking, and she blocked CONSTANZO on social media for a while. A few months later, CONSTANZO added MV2 back on his Facebook and agreed to give her free drugs after he found out MV2 had a bad experience with the pills.

52.     MV2 said that on Friday (July 23, 2021) she was in contact with a guy by the name of Raul on Snapchat. In their conversation, Raul stated he knew CONSTANZO and that CONSTANZO was his drug dealer. Per Raul's request, MV2 sent several nude photos/videos of herself via Snapchat. MV2 noticed that Raul saved the photos/videos on his Snapchat camera roll. MV2 then blocked Raul to avoid conversing with him.

53.     MV2 explained that on Saturday (July 24, 2021), a male she identified as Kurt added her on his Snapchat account and proceeded to communicate with her. In their conversation, Kurt told her that it was the best video he had ever seen. MV2 stated she knew right away that Raul had sent her nude photos/videos to Kurt. Kurt then told her that she had to meet up with CONSTANZO in a building, and punish Raul there, since he had sexually harassed her. Kurt told MV2 that he and Raul would hurt someone if MV2 didn't go. MV2 was also supposed to get some drugs from inside the building for Kurt. At the time, MV2 did not provide any details about when and where she would be meeting CONSTANZO.

54.     MV2 stated that on Monday, (July 26, 2021) during the morning hours, she was in communication with Kurt, Raul, and CONSTANZO on Snapchat. Kurt told her to meet up with

22

CONSTANZO and go to an abandoned building with him. MV2 stated she was anxious because she thought someone might be hurt if she didn't comply. Kurt and Raul also told her via text messages, that "they hurt people and they would hurt her". Raul also told her that a "bunch of guys would go to my house and rape me and kill my family" if she didn't comply.

55.     MV2 stated that at approximately 1200 hours on July 26, 2021, MV2's friend dropped her off outside a residence which MV2 described as being a red brick house with white trim which Detectives later confirmed as CONSTANZO's residence in Torrington, CT. MV2 stated CONSTANZO then walked out of the residence and met with her. They both walked to the abandoned building, which was close in proximity from his residence. During the walk, MV2 didn't talk a lot because she was scared. Prior to entering the building, they stood outside and waited until the vehicles drove by. CONSTANZO and MV2 then entered the building (identified as the Torrington Company) through an unlocked door. MV2 described the inside of the building as being "sketchy", with puddles of water everywhere, and with different rooms throughout. Once inside, CONSTANZO told her that he wanted to get it over with. MV2 believed that it was the original plan they had talked about, which meant she was supposed to hurt Raul, and get the drugs for Kurt and his guys.

56.     MV2 stated that while in the building, CONSTANZO made MV2 take all her clothes off and stand with her arms out as he took nude photos of her with his cellphone. MV2 described the cellphone as being a black Apple iPhone. MV2 said CONSTANZO then sent the nude photos to Kurt and CONSTANZO showed her a text message from Kurt. In the text message, MV2 saw that Kurt told CONSTANZO to have sex with her, and that if she refused, Kurt would kill her.

57.     MV2 stated that CONSTANZO also retrieved a pocketknife from his pocket and had it on her neck. At one point, MV2 grabbed the knife to get it away from her neck. CONSTANZO got mad at her and told her to stop and said "I don't want to do this". CONSTANZO also had a large knife, silver in color in his backpack. MV2 mentioned that she observed the large knife but did not state that it was used on her at any point. MV2 also stated she told CONSTANZO that she didn't want to die by the knife. CONSTANZO told her that she could die by the knife, or he could put her to sleep. MV2 asked CONSTANZO what he meant by that, and he told her that he would choke her. MV2 reported that CONSTANZO put her against the wall, as he attempted to choke her with his hand around her neck. MV2 said she couldn't breathe, became lightheaded, and she almost passed out. MV2 stated that the only reason CONSTANZO stopped was because she had peed on herself.

58.     MV2 stated CONSTANZO put the knives away and at one point had her "suck his dick" as he videotaped it with his cellphone. It didn't last for long since MV2 was crying and kept spitting saliva. MV2 stated nothing came out of CONSTANZO's penis, adding that CONSTANZO attempted to have sex with her twice in two different locations inside the building. MV2 reported CONSTANZO took off his pants and left his shirt on as she laid naked on the floor. MV2 had removed her tampon and left it on the ground. CONSTANZO attempted to put his partially erect penis into her vagina, but only the tip of the penis went in. MV2 stated that CONSTANZO had her get on her knees and hands, as he was partially kneeling behind her and attempted to penetrate his penis in her vagina, but only the tip of his penis would go in. CONSTANZO did not use a condom. CONSTANZO was mad and grossed out because she was menstruating. MV2 disclosed that at one point that she was bleeding on CONSTANZO, and he

stopped. MV2 reported that during the assault, CONSTANZO pulled her hair after he thought she was pulling away.

59.     MV2 stated she pretended to be friendly with CONSTANZO as she grabbed him and tried to hug him. MV2 attempted to reason with CONSTANZO and asked him not to hurt her and that she wanted to go home. MV2 started talking to him about a puppy that she owns. CONSTANZO told her that everyone has a family and that she wasn't as important as his family. MV2 continued begging CONSTANZO to let her go. MV2 was already dressed at this point, and a white male wearing a face covering on his mouth, had walked by them in the basement area. The male had looked at MV2 since she was crying, and her hair was a mess from CONSTANZO pulling at it. MV2 believed that the male had said hi to CONSTANZO, as he walked away.

60.     MV2 stated that the ordeal ended only after she begged him to let her go. MV2 told CONSTANZO that she wouldn't tell anyone and CONSTANZO grabbed her by the face. CONSTANZO told her that he wasn't joking around, and that if she told anyone he would go to her house and hurt her. CONSTANZO also told MV2 to plan on seeing him at the end of each month in the same building. In addition, CONSTANZO told MV2 to add him back onto her social media account, and to keep her location on her cellphone turned off. MV2 had also said that at one-point CONSTANZO had grabbed her cellphone and deleted some evidence from it including some chats with Kurt and Raul.

61.     MV2 stated once she was away from CONSTANZO, she walked down the street and she contacted her boyfriend to request he pick her up. Her boyfriend's father picked up MV2 and took her home. MV2 didn't disclose to her boyfriend's father what had just happened. At the house, MV2 contacted one of her friends and told her about the assault.

62.     MV2 had originally told her boyfriend and her parent that she had gotten into a fight with a girl that had choked her. MV2 said the next day (July 27, 2021), her parent and her boyfriend took her to the hospital because she complained about her neck hurting due to the fight. While enroute to the hospital, MV2 told her boyfriend about the sex assault, and she also told her parent about it. After the Winsted hospital evaluation, they went to the Torrington Police Department, and then to CHH to complete a sex assault kit. MV2 stated she didn't realize until this forensic interview that she was raped because MV2 believed that the penis had to penetrate the vagina all the way to be rape.

63.     Detective Gelormino interviewed MV2's friend that dropped MV2 off at CONSTANZO's residence on July 26, 2021. MV2's friend stated MV2 had provided her with CONSTANZO's cellphone number, 860-782-1747 ("DEFENDANT'S PHONE NUMBER"), and his Snapchat username, TARGET SNAP ACCOUNT 2. MV2's friend continued communicating with CONSTANZO throughout the next couple of months through social media. During the week ending July 17, 2021, MV2's friend was in contact with CONSTANZO through social media. CONSTANZO claimed that MV2 sent him a few nude photos of the friend that MV2 had taken of her a few months ago. CONSTANZO told MV2's friend to hook up with MV2's boyfriend to get back at her. MV2's friend didn't continue with the conversation regarding MV2 and she didn't see any of the nude photos that CONSTANZO claimed that he had. MV2's friend admitted to taking nude photos with MV2 a few months ago on each other's cellphones but she thought MV2 deleted the photos like she did.

64.     MV2's friend said that on July 26, 2021, during the morning hours, CONSTANZO contacted her through Snapchat and requested that she pick up MV2 and drop her off at his house located at 32 Pulaski Street, Torrington, CT. CONSTANZO said that MV2 and

he were going to "hook up" but he didn't go into details. MV2's friend explained that the word

'hooking up" means getting to know a person better, kissing, and possibly having sex with each

other. MV2's friend and her boyfriend then drove to Winsted and picked up MV2. On the drive

back to Torrington, MV2 didn't say much in the vehicle. They dropped MV2 off at what was

later determined to be CONSTANZO's residence.

65.     On August 16, 2021, Torrington Police contacted CONSTANZO via his

cellphone, the DEFENDANT'S PHONE NUMBER, and he agreed to speak with Detectives at

the police station. A short time later, CONSTANZO arrived at the front lobby, and was escorted

to the interview room located in the detective division where the interview was audio and video

recorded. CONSTANZO was advised of the complaint that was lodged against him by MV2.

CONSTANZO was advised of MV2's first and last name, and the town she resides in.

CONSTANZO then claimed he doesn't even go to that town.

66.     CONSTANZO was advised that the incident had occurred about two weeks ago,

but initially CONSTANZO was not told about the abandoned building. CONSTANZO was

asked if he remembered a girl that was dropped off at his house. CONSTANZO identified a girl

with same last name but different first names that he knows from Instagram (identified as MV2).

CONSTANZO reported that MV2 wanted to hang out with him at his "crib" (identified as his

residence). CONSTANZO described MV2 as being about 5'6'', dirty blonde hair, thin build.

CONSTANZO denied making contact with MV2's friend to pick up MV2.

67.     CONSTANZO said on that particular day, he was outside his house, when MV2

was dropped off by her friend who was in a car with an unknown male. CONSTANZO had

already told MV2 he wasn't going to be home, because he was going to a friend's house, that he

identified as Will (unknown last name). CONSTANZO claimed that MV2 instead started to

request different types of drugs from him, and he said no. CONSTANZO stated he doesn't sell drugs, and that he only smokes marijuana. CONSTANZO stated that MV2 followed him to Will's house. CONSTANZO told MV2 to leave him because she was persistent on him giving her drugs /alcohol. CONSTANZO was not willing to provide a last name or a home address for "Will" but that stated he lived in the area of Stop & Shop located on High Street in Torrington, CT. CONSTANZO claimed that he walked past the Mobile Station on North Elm Street with MV2 to get to Will's house. CONSTANZO was unwilling to provide any further contact information on Will.

68.     CONSTANZO was then asked if he has ever been in the abandoned building near his house. CONSTANZO replied he goes there to smoke with his friend, Will, on top of the roof. CONSTANZO was asked if he was inside the building with MV2 on the day she had been with him, and he did not answer the question. CONSTANZO instead replied that he had told MV2 to leave him alone that day, because she was persistent in asking him for drugs. CONSTANZO was advised that MV2 had reported to the police he had sex with her. CONSTANZO instead said MV2 was 16 years old, and he is 19 years old. Later in the interview, CONSTANZO denied ever having sex with MV2 or attempting to have sex with MV2. CONSTANZO stated that MV2 may have claimed that he had sex with her because he had denied her drugs.

69.     CONSTANZO started to explain that MV2 had also "catfished" him (a term used to describe posing as another person) after that day, using the name Cleo with MV2's last name, on Instagram using a fake photo that represented herself. CONSTANZO explained that MV2 told him that he was going to get into trouble for selling drugs to minors, and MV2 had also attempted to extort money from him. CONSTANZO stated that MV2 said she was talking to his friends on Instagram. CONSTANZO said MV2 also told him that she hoped his family died.

CONSTANZO stated he reminded MV2 that she had a boyfriend and to stop bugging him, and he blocked her on social media. CONSTANZO said that he told his friend about it and sent him a screenshot of it. The Detective requested a copy of the messages or a photo of the person that "catfished" CONSTANZO and CONSTANZO stated he didn't have it on his cellphone.

70.     The Detective requested to download CONSTANZO's cellphone in attempt to assist with the investigation and to locate the individuals on social media that he was talking about, but CONSTANZO declined to provide consent. CONSTANZO allowed the Detective to look at a screenshot of a message that was sent from a person by the name of Cleo which stated that CONSTANZO was going to get arrested for selling drugs to a minor. CONSTANZO responded back and stated that he believed it was MV2's boyfriend. The Detective noted that the message was hard to follow. The Detective asked CONSTANZO if he still had MV2 or Cleo on his Snapchat account, and CONSTANZO said no.

71.     The Detective asked CONSTANZO about Raul and Kurt, and CONSTANZO explained that he knows both of them through social media. CONSTANZO said Kurt is from Philadelphia and Raul is from New Jersey. After confronting CONSTANZO about the conversation he had with Raul and Kurt on Snapchat with MV2, CONSTANZO claimed that other people use his account including Raul and Kurt and they can log into his account from anywhere in the world.

72.     CONSTANZO was asked if his DNA would be found on any evidence, including MV2's clothing, and he said no. CONSTANZO then read/signed a consent to search form for his DNA. Detective Gelormino collected a buccal swab from CONSTANZO, and it was sealed. The buccal swab was later placed into evidence and sent to the forensic lab for comparison to the evidence from the sex assault kit.

73.     Detective Gelormino reviewed the Cellebrite forensic report for MV2's cellphone which included screenshots that were taken of the conversation MV2 had with Kurt and with Raul on the Snapchat app. The screenshots did not have a date/time stamp on them. The screenshots show MV2 was in communication with a person on Snapchat, with a Display Name of "Kurt Romen" and username TARGET SNAP ACCOUNT 3. Kurt Romen's Snapchat profile had a light skinned black male cartoon avatar with high hair. During the conversation, Kurt tells MV2 that she was "fucked" up if she thought she could demand "shit". MV2 responded back and told Kurt that her tone was lowered, followed by a smiling emoji. MV2 also told Kurt to imagine if their nudes were sent to their partners (identified as a boyfriend or girlfriend). Kurt responded back and told MV2 that whoever threatens Raul needs to calm down before he makes them lay down.

74.     The screenshots also show that MV2 was in communication with a person on Snapchat with a Display Name of "Raul Rex" and username TARGET SNAP ACCOUNT 4. Raul Rex's Snapchat profile had a light skinned black male cartoon avatar with short hair. In the conversation with Raul, MV2 told Raul that Chris (identified as CONSTANZO) told her that Raul needed to leave her alone until Tuesday, since she wasn't home. Raul replied back, and told her that they had a deal, and now she is "fucking" it all up right now. Raul requested that MV2 send him additional videos of herself, and she responded back and said that she had one. MV2 also stated that she couldn't do it anymore, and that she would call the cops. Raul then told MV2 to promise him 8 more videos when she sees "Shaggy" (CONSTANZO) on Tuesday, including the one video she had already made. Raul also told MV2 that if she called the police, he would "send his men". Also in the conversation, Raul asked MV2 if she would obey what he said, or if he would have to use force. Raul stated this was not up to him, and that if he didn't get this (it

appeared he was speaking about nude videos), he would get killed. Raul stated it was not up to him and that it was up to the higher up who wanted the videos.

75.     Raul explained that if he didn't get the video, he was fucked, so it was either him or MV2. Raul also told MV2 that he was not going to allow her to get him killed. Raul asked MV2 how that tear would feel when she has "10+ inches raping". Raul stated "my distro wants to embarrass shaggy and you for fucking the up so royally". Raul requested that MV2 "dare each oter to take each others cothes of and fuck on video for 3+ hours if shaggy cant make it all 3 then take breaks but it has to be over 3 hours long". Raul mentioned sending MV2 money afterwards; MV2 asked Raul if he did "coke", and he responded that he sells it. Raul also requested that MV2 get drugs from "Shaggy", and that he would pay her for it after. Raul also asked MV2 if she was supposed to get "shrooms" (identified as mushroom) today, and she said yes, but she wouldn't be able to get other stuff because her sister was going to get it with her and would be mad about it. MV2 also told Raul that she had taken screenshots of him requesting drugs and nudes from her, and that she was a minor. Raul responded back that he's beaten murder charges while he was at the scene of a crime. Raul also mentioned MV2's boyfriend's home address and said "then ill just wait for him to be with you and kill him right in front of you".

76.     Records obtained from Snapchat in January 2022 for TARGET SNAP ACCOUNT 2 revealed that it is an active account created on March 23, 2019 from IP Address 107.77.195.23 operated by AT&T, is associated with email address TARGET GMAIL ACCOUNT 5 and is associated with the DEFENDANT'S PHONE NUMBER. The display name for this account is LilShag. The last login to the account occurred on December 1, 2021 at 22:57:07 UTC from IP Address 174.44.167.30 operated by Optimum Online.

77.      Records obtained from Snapchat in January 2022 for TARGET SNAP ACCOUNT 3 revealed that it is an active account created on July 23, 2020 from IP Address 24.46.179.73 operated by Optimum Online, is associated with email address TARGET GMAIL ACCOUNT 6 and is not associated with a telephone number. The display name for this account is Kurt Romen. The last login to the account occurred on September 30, 2021 at 02:30:11 UTC from IP Address 107.77.224.210 operated by AT&T.

78.      Records obtained from Snapchat in January 2022 for TARGET SNAP ACCOUNT 4 revealed that it is an active account created on July 15, 2020 from IP Address 24.46.179.73 operated by Optimum Online, is associated with email address TARGET GMAIL ACCOUNT 7 and is not associated with a telephone number. The display name for this account is Raul Rex. The last login to the account occurred on August 25, 2021 at 17:04:51 UTC from IP Address 107.77.223.108 operated by AT&T.

79.      Analysis of the IP Addresses used to access TARGET SNAP ACCOUNT 2, TARGET SNAP ACCOUNT 3 and TARGET SNAP ACCOUNT 4 on July 26, 2021 when MV2 alleges that she was sexually assaulted revealed the same AT&T IP Address accessed all three accounts within a short period of time. I know from my training and experience that IP Addresses are frequently reassigned to cellular devices since there is a limited pool of IP Addresses operated by each cellular provider. Therefore, cellular providers assign IP Addresses when a cellular device initiates a connection to the internet, but cellular providers return the device's IP Address to the shared pool after the device's internet activity becomes dormant. When the cellular device again needs to connect to the internet, the cellular provider assigns a new IP Address to the device from the shared pool.

80.     Since TARGET SNAP ACCOUNT 2, TARGET SNAP ACCOUNT 3 and

TARGET SNAP ACCOUNT 4 were accessed within a short time period from the same AT&T

IP Address, this indicates that a cellular device maintained its lease of the IP Address due to

activity and that one cellular device sequentially accessed all three Snapchat accounts.

Furthermore, since these Snapchat accounts were never logged into simultaneously and only one

account was accessed at a time, it is likely that there is only one operator accessing and

controlling these accounts who is required to log out of an account on a device before accessing

the next account.

81.     A review of the Snapchat account access logs on July 26, 2021 revealed the

following:

j.      TARGET SNAP ACCOUNT 4 was logged in at 00:25:25 UTC from IP Address

107.77.224.71 operated by AT&T.

k.      TARGET SNAP ACCOUNT 4 was logged out at 00:30:49 UTC using IP Address

107.77.224.71 operated by AT&T.

l.      TARGET SNAP ACCOUNT 2 was logged in at 00:31:41 from IP Address

107.77.224.71 operated by AT&T.

m.      TARGET SNAP ACCOUNT 2 was logged out at 02:29:38 UTC using IP Address

107.77.224.71 operated by AT&T.

n.      TARGET SNAP ACCOUNT 3 was logged in at 02:29:41 UTC from IP Address

107.77.224.71 operated by AT&T.

82.     Records obtained from AT&T revealed that CONSTANZO had an account for

cellular service with AT&T since April 8, 2021 and CONSTANZO is assigned the

DEFENDANT'S PHONE NUMBER. CONSTANZO's AT&T account was suspended on November 15, 2021 for non-payment.

83.     In addition, a review of the Snapchat account access logs on July 26, 2021 revealed that TARGET SNAP ACCOUNT 2, TARGET SNAP ACCOUNT 3 and TARGET SNAP ACCOUNT 4 were all accessed from IP Address 174.44.167.30 operated by Optimum Online which provides residential internet service. Since the three Snapchat accounts were accessed within a short time period from the same Optimum Online IP Address, this indicates that the operator(s) of those accounts was/were in the same physical location. Commercial services revealed that IP Address 174.44.167.30 geolocates to Torrington, CT or the surrounding area.

84.     A review of the Snapchat account access logs on July 26, 2021 for IP Address 174.44.167.30 operated by Optimum Online revealed the following:

o.     TARGET SNAP ACCOUNT 3 was logged in at 10:33:52 UTC from IP Address 174.44.167.30 operated by Optimum Online.

p.     TARGET SNAP ACCOUNT 3 was logged out at 10:34:25 UTC from IP Address 174.44.167.30 operated by Optimum Online.

q.     TARGET SNAP ACCOUNT 4 was logged in at 10:34:27 UTC from IP Address 174.44.167.30 operated by Optimum Online.

r.     TARGET SNAP ACCOUNT 4 was logged out at 10:46:06 UTC from IP Address 174.44.167.30 operated by Optimum Online.

s.     TARGET SNAP ACCOUNT 2 was logged in at 10:46:38 UTC from IP Address 174.44.167.30 operated by Optimum Online.

t.      TARGET SNAP ACCOUNT 2 was logged out at 16:05:22 UTC from IP Address 174.44.167.30 operated by Optimum Online.

85.     On November 23, 2021, the Torrington Police Department seized the DEFENDANT'S PHONE pursuant to a State of Connecticut Search Warrant related to the investigation of the sexual assault of MV2. The search of the defendant's phone was limited by the search warrant to January 21, 2021 until February 13, 2021 and July 23, 2021 until July 26, 2021. The forensic examination of the DEFENDANT'S PHONE revealed that the phone number associated with the phone was the DEFENDANT'S PHONE NUMBER. The examination further revealed the username saved for the Snapchat app on the device is TARGET SNAP ACCOUNT 2. A review of login credentials saved in the Chrome web browser of the DEFENDANT'S PHONE revealed 16 additional Snapchat accounts, including TARGET SNAP ACCOUNT 3 and TARGET SNAP ACCOUNT 4. In addition, the saved username for the Gmail app on the DEFENDANT'S PHONE was TARGET GMAIL ACCOUNT 5.

86.     Records obtained from Google in January 2022 for TARGET GMAIL ACCOUNT 5 revealed that this account is subscribed to "chris constanzo", the account was created on May 24, 2019 from IP Address 107.77.225.35 operated by AT&T and the account was last accessed on November 21, 2021 at 18:34:20 UTC from IP Address 174.44.167.30 operated by Optimum Online. The recovery email address and telephone number for TARGET GMAIL ACCOUNT 5 are TARGET GMAIL ACCOUNT 6 and the DEFENDANT'S PHONE NUMBER.

87.     Based on the foregoing, including the sequential logins to the three Snapchat accounts (TARGET SNAP ACCOUNT 2, TARGET SNAP ACCOUNT 3, and TARGET SNAP ACCOUNT 4) from the same IP addresses and that the login credentials for the three Snapchat

accounts were all saved on DEFENDANT's PHONE, I believe the DEFENDANT's PHONE was used to login and access all three Snapchat accounts.

88.     Records obtained from Google in January 2022 for TARGET GMAIL ACCOUNT 6 revealed that this account is subscribed to "regem draco". This account was created on February 16, 2019 from IP Address 107.77.223.226 operated by AT&T and was last accessed on January 14, 2022 at 19:17:17 UTC from IP Address 2600:100c:b248:3581:48a9:840:1835:13d7 operated by Verizon. The recovery email address and telephone number for this account are biz_14@yahoo.com and the DEFENDANT'S PHONE NUMBER.

89.     Records obtained from Google in February 2022 for TARGET GMAIL ACCOUNT 7 revealed that this account is subscribed to "raymond regem". This account was created on July 12, 2020 from IP Address 24.46.179.73 operated by Optimum Online and Google did not provide additional IP Address login history.

90.     The forensic examination of the DEFENDANT'S PHONE also revealed that the Apple iCloud account for this device is TARGET ICLOUD ACCOUNT 8 which is the same email address as TARGET GMAIL ACCOUNT 5. The last backup to iCloud for this device occurred on November 23, 2021 at 06:13:47 UTC.

91.     The forensic examination of the DEFENDANT'S PHONE using Cellebrite forensic software by the Torrington Police Department recovered text messages between CONSTANZO and MV1 from July 23, 2021 until July 26, 2021. During these messages, CONSTANZO and MV1 appear to play a game together on their phones and MV1 sends pictures of her face after applying makeup. The forensic examination also revealed that

CONSTANZO provided his Snapchat account to MV2's friend on July 25, 2021 as TARGET SNAP ACCOUNT 2.

92.     The forensic examination of the DEFENDANT'S PHONE using Cellebrite forensic software by the Torrington Police Department did not recover Snapchat messages, email messages, or images/videos of MV2. However, I know from my training and experience that providers such as Snapchat, Google and Apple all maintain customer information on company servers for accounts and it may be possible to obtain data from these providers even if the data no longer exists on a user's device. I also know that Homeland Security Investigations has access to additional forensic software that may be able to extract more information about the usage of the DEFENDANT'S PHONE and may also extract information from the apps installed on the DEFENDANT'S PHONE which could result in the recovery of additional information not recovered during the forensic examination of the DEFENDANT'S PHONE performed by the Torrington Police Department.

## CONCLUSION

93.     Based on the aforementioned factual information, there is probable cause to believe, and I do believe, that evidence of the TARGET OFFENSES is located within the TARGET RECORDS, which constitute and contain items that constitute contraband, fruits, instrumentalities and evidence of crime, or material otherwise criminally possessed, or property that is or has been used as the means of committing the TARGET OFFENSES.

94.     In consideration of the foregoing, I respectfully request that this Court issue a warrant authorizing the search of the TARGET RECORDS, described in Attachment A, for the items more specifically identified in Attachment B.

95.     Because one of the warrants only seeks permission to examine a device already in

law enforcement's possession, and the remaining warrants will be served on internet providers, who will then compile the requested records at a time convenient to them, the execution of the warrants does not involve the physical intrusion onto a premises, and therefore good cause exists to permit the execution of the requested warrants at any time in the day or night.

_____
Special Agent Ryan Mahar
Department of Homeland Security
Homeland Security Investigations

The truth of the foregoing affidavit has been attested to me by Ryan Mahar over the telephone on this \_\_\_\_\_ day of February, 2022, at Hartford, Connecticut.

_____
HONORABLE ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE